My name is Rebecca Pennell. I represent Dean Shelton. I initiated the appeal, so I made the assumption I would initiate the oral argument. There are several issues raised. The first several issues go to the stop of the vehicle and the search of the vehicle. There's also the evidence at trial and a sentencing issue that the government has raised. I wanted to begin by talking about the initial contact with the vehicle. And there's two questions, whether or not there was reasonable suspicion initially, based solely on a 911 call, and then at what point in time was the vehicle stopped. After a motion for reconsideration, the district court determined that there was no reasonable suspicion until the officers got to the vehicle and saw a tire iron inside and a broken window. The facts that were brought out at the evidentiary hearing on this were just very, very thin. If you read through the evidentiary hearing and you read through Judge Whaley's order, Corporal Walters only said that the vehicle was parked in a handicapped spot in front of a hospital, according to what he'd heard from the 911 call. The vehicle was parked, according to the caller, in a handicapped spot, occupied by two males, and one of the windows was broken out. And this was suspicious. This is all that Corporal Walters testified to at the evidentiary hearing as to what he knew when he stepped out into the parking lot. He then saw a car. He did not specify that the car was in the handicapped spot. It had driven to another location. And he started going over to the car, and two other officers pulled behind the car. Was there a seizure at that point, in your view? In my view, there was a seizure at that point. And, again, the record is so thin. The government says, well, this was a public space, and Mr. Shelton could have driven away. Where are those facts in the Kim case that they cite to? Where are the facts that he is detained? I mean, where are those facts? The government has the burden of proof to show that he's not. There were two police cars that pulled in behind him. There were those facts, in addition to a third separate police officer walking up to the car. Unlike the Kim case, where the government talked about how far away, it was partially blocked, the person was only on the passenger side, he could have left, there was a storefront right outside of it. But there were very specific facts shown by the court in that case to show that the defendant, that it was a consensual encounter, and that looking to the Supreme Court's bus cases, that even though the defendant was already in a certain location. Why is that somewhat irrelevant? Because by that time, he knows this is a tire. He sees a broken-off window and a tire. So it looks like this is a freshly broken-into car. And why does it become sort of moot at that point? Why isn't he enough to detain the car and make sure that what he hasn't got here are two guys who broke the back window and are stealing this car? Your Honor, because the stop occurred before he found out about that. Before he found out about that, the two cars were parked behind the probe, and he walked up to it. At that point in time, to look to the language from the Kerr case, there wasn't a reasonable alternative for the car but an encounter with the police. So at the same time, they pulled up right about the time he was stepping up to the car, a couple of the police cars, other cars showed up, and he sees the tire iron. There was one officer on foot. Correct. Did he see the tire iron? He testified that he did not. The officer on foot was Corporal Walters. He testified that he did not see the tire iron until he was at the car and looking at the passenger and looking through the window. It wasn't until that moment. He didn't see it when he was across the parking lot. The other officers were there when Corporal Walters was in the parking lot because he said, he pointed out to Officer Kirby, there's the vehicle. So they all descended on the car at the same time, and it's our position that that descending and surrounding the car, like in the U.S. v. Washington case when the defendant stepped out of his apartment and was surrounded by police officers, that at that point in time, a reasonable person wouldn't have thought, I can just drive on my way. You don't have surrounding. You have them pulling up behind him. There's no surrounding. It's unclear from the facts whether or not there was any option, and that was the government's burden, to show that there would have been an option for the driver or the passenger to pull away, to get out of the car. Well, let's assume that he couldn't drive out, but the intent of the officers as they came up, nobody was sure that there's a crime that's been committed or that there should be any arrest. But there was some reason to ask some questions. Well, again, unfortunately, in many cases, the intent of the officers is not the question. What would a reasonable person in the car feel like? And I would submit that if you have a police officer walking up to the passenger side of your car and two other officers pull in behind you, a reasonable person wouldn't think, I can get out of the car and run away, or I can just start to drive away. A reasonable person would think that contact with the police at this point is inevitable. And because they seized the car at that point in time, the occupants of the car may well have decided to go away since the passenger had a warrant out for his arrest. Had they had the opportunity to go away, they would have. And clearly, the moment that a conversation occurred, it wasn't consensual because the passenger was saying, I don't want to give you my name, and the police officer insisted. By that time, he seized the car. Correct. And we haven't argued that at that point in time, given the broken glass, given that there was apparently some sort of corroboration of the call at that point in time, we haven't argued that there was no reasonable suspicions at that point in time. But the points in time are significant. The points in time that differentiate a consensual encounter versus a detention are important. And it was the government's burden to show that no illegal detention occurred. And they did this very quickly. They didn't spend very much time with the officer describing, well, what's the layout of the parking lot? How long did this take? When exactly did the cars pull behind? They didn't do that. I think just operating under the assumption that for some reason this was permissible and then on appeal pointing to the trial testimony of what the recipient witness that called 911 said as opposed to what was put on at the evidentiary hearing. Well, let's say the cars came up behind so they couldn't get out. They didn't have the intent at that moment to arrest, but they did have some suspicion. Now, could they keep that car immobilized until they were satisfied that there was no reason to keep them? At that point in time, before they saw the tire iron, there was no reasonable suspicion. I think that police officers always have suspicion when they do things. Otherwise, they wouldn't waste their time. So they certainly had suspicion, but it wasn't founded suspicion on anything. Both the information that the officer relayed that a car had been parked in a handicapped spot and it had a broken window, those weren't even facts that suggested anything illegal. He didn't even say at that point in time anything about the tire iron. It's illegal to park in a handicapped spot. If you're not handicapped. Yeah. And so they didn't even know at that point in time, you know, whether or not the person was handicapped or not. So nothing in and of itself suggested there was a definitive crime that occurred. They have to be handicapped, but they have to have a proper sticker. Right. But there was no information saying it was parked in a handicapped spot with no handicapped sticker. It was just, I guess, an assumption that if you're parked in a handicapped spot, you're not handicapped. But especially in the context of a hospital, I don't think that that's reasonable. So these things weren't explained. I mean, when I go through the record, and myself not having been at the evidentiary hearing, I'm kind of in the position that you all are, trying to figure out what was there, and there's just one sentence by Corporal Walters explaining what he'd been informed of when he walked out into that parking lot. It was just three very brief things, that there was a car parked in a parking lot, the window had been broken out, and there was two males in it, which he was wrong on the two males as it came out at trial. But that wasn't enough to think that there was criminalization. I thought there were two males. What's that? I thought there were two males. At the time the vehicle was stopped, the caller actually came out at trial, testified at trial. The defense called him as a witness at trial. And this goes to the sufficiency argument. Actually, at the time that the caller saw the car parked in the hospital parking lot, there was only one person in the car, and that person was the passenger, Mr. Santos, the person that ended up being arrested, the person who had a felony conviction and was himself prohibited from having a firearm, which goes to our sufficiency argument. This was not a case where a gun is found in a car and the defendant has always had exclusive access to and control of a car. This court for a long time, for decades, has held that when there is not exclusive control over the premises, that it's not good enough for the government just to prove presence and accessibility to a firearm. He also owned the car. Didn't Sheldon also own the car? He owned the car, but he didn't have exclusive possession, especially because. . . Owning the car is a big consideration. It may have been a big fact. I think the presumption that goes with owning a car is that you maintain exclusive control of it if you're the owner. And the defense showed, in its case in chief, that that presumption did not hold true in this case. In this case, Mr. Sheldon was not always in the car and was not always in the car moments before the police came. And, in fact, the passenger was behaving suspiciously. If there's something hidden in the car, there's at least enough there for a chiropractor to find that it belonged to the owner of the car. It was on the driver's seat side. There was a panel that was loose that could easily be seen by the driver. And he owned the car. I don't know how. . . The record was not clear how easily it could be seen just from driving. The record was that you could easily see the panel was loose. But could you easily see the firearm? The record was not clear on that. And this Court's cases are clear that we don't make those sorts of assumptions. If there's any sense left, are you going to speak? I mean, you've got bigger problems. There's the issue of the sentencing as well. On a completely different subject, should we be holding this case for Arizona v. Gantt? I think so. Having read the transcript on that, I think there's a very real possibility the Court will limit Belton to situations where a search occurs before an occupant is secured in a police car. Once they're in the police car, it's akin to them being at the station house. If that's the way the Supreme Court goes, this search took place well after Mr. Santos was in the police car and secure, and the district court found there would have been no basis to search the car. So, yes, I'm hopeful that Gantt will come out before the end of the year. It was, I think, the third case argued in this term. Do we know when it's going to be argued? It was already argued. It was argued on the second day of the term, actually. So it should be coming out, I would hope, before too long. With respect. . . If we take Santos out of the picture, there's no basis for the search of the car? There's no basis for the search of the car. When did they arrest Shelton? They. . . They arrested him for obstructing. . . They didn't arrest him until they. . . Well, obstructing, and that, again, will turn on the Supreme Court case, because all Shelton was doing is saying, I have a right not to have you search my car. Well, it's still obstructing. Let's say, in fact, the police have no right to search the car at all. He can't stop and say, no, I'm going to keep you from doing it because I know my constitutional rights. He steps aside, he lets the car be searched, and then litigates a question in court. So I don't see how, once he gets arrested for obstruction, his arrest doesn't justify the search of the vehicle. Well, I disagree with that. But more importantly, by the time the officer. . . Why don't you explain to me why you disagree? Well, by the time the officer asked for permission, didn't ask for permission, before he told Mr. Shelton, I'm searching your car, Mr. Santos was secured. So there was no basis for the officer to say that. I'm assuming that the Supreme Court comes out that way and says there's no basis for the, and the police officer was entirely wrong and legally unjustified in searching the car. Nevertheless, he gave an order, get out of the car because I'm going to search it. Assuming that you have constitutional right, I think you do have the right. . . If the police come to my house at night and say, we're searching your house, and I say, do you have a warrant? And they say, no. I think I'm perfectly within my rights to say, you can't search my house with a warrant. Or I'm perfectly in my rights to say, at a traffic stop, you can't search my car. I know you think that, but I don't think you have any authority to support that. If you're confronted with the police, and the police give you an order, the fact that you disagree with the order and you may even be right with the order, doesn't mean that you can obstruct what they're doing. You can litigate it later. You can do as they say and then litigate it later. I don't think you can put up physical resistance. I think putting up physical resistance, even when you're legally justified, is itself illegal. And he never did. All there was was verbal going back and forth. The record was very clear. There was never... He was arrested for obstructing. He was, based solely on the verbal back and forth. Solely based on verbal back and forth. Shelton saying, I haven't done anything wrong. You can't search my car. He didn't get out of the car when he was... Not initially, until the officer said, if you don't get out of the car on your own, I will take you out. And at that point in time, Mr. Shelton got out of the car. And they arrested him for... And they arrested him for obstructing. And I think... How have we challenged the arrest for obstruction of lack of probable cause? I think you could. And I think that... Did you? I think that that was thrown out, actually. It was not a Federal charge. So I'm not abundantly familiar with the obstruction charge. But did you, in this case, challenge that arrest? The arrest for obstructing. The arrest for obstructing wasn't charged. The basis for the search, as initiated, was the arrest of Santos. The officer said, at trial all along, the reason I was searching the car was the arrest of Santos. Based on suppression? Yes. Based on the arrest of Mr. Shelton, there wasn't a separate suppression motion. I mean, all the Fourth Amendment issues, the taint started earlier. So the Shelton arrest stands. It's never been challenged or set aside. And why doesn't that support search of the vehicle, independent of what may have happened with Santos? There was a prior taint. And under Wong Sung, the prior taint, he was... Prior taint. The taint was the officer saying, I'm going to search your car because of the arrest of Santos. And that was an illegal, that was an order by the police saying, I'm going to search your premises without basis. The authority that that somehow taints the arrest of obstruction is what? Well, submission, the mere submission to... Well, this issue wasn't brief, so I can't think of the cases on the top of my head. But I remember the wording quite well, that mere submission to police authority, which is eventually what happened, is not consent to search, does not make a Fourth Amendment violation legal. And the police officer was saying, I'm going to search your car. And the police officer had, at that point in time, no basis to issue that order. He got arrested for obstructing. This is not a consent rationale. This is not like he consented to anything. He got arrested for failing to consent. And you say, oh, well, that was tainted because the need to search the car was justified by something else. But where does the fact that the officers reasoned for the search, how does that taint the arrest for the obstruction? Well, I guess I see it differently. I see that if the officer is not entitled to search and all he's doing is asserting his rights, there's no probable cause to have the officer order him out of the car or to threaten arrest. And that's part of the Fourth Amendment taint. So what? He's nevertheless arrested him. And maybe you litigate it later, and what happens... You've never set that aside. You've never challenged that arrest. Well, it's the government's burden to say why did they search. When we say there was an illegal search, they say it was because of the arrest of Santos. So, yes, they didn't say it was only because. They never said we searched the car because of the arrest of Shelton. They said all along the reason we searched the car was because of Shelton. And law enforcement officers do not have to search a car after arrest. The record was never made that had Shelton not been arrested, had in the Wong-Sung analysis that been taken away somehow. I mean, I just don't think you'd get there because I don't Mr. Shelton never would have been in that situation had Mr. Santos, had that interaction not occurred. Your point. My time is up. I didn't discuss the sentencing issue, but it is briefed. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court. Counsel, my name is Ani Ahmed. I represent the government in this case. And I do want to start out with a factual dispute that we're having at this point as to the stop itself. I would submit to this Court that once Officer Walters did see the tire iron in the back of the vehicle. Where did we get that evidence? That he saw it? Uh-huh. Your Honor, he testified not only at the suppression hearing, but he testified at trial as well. And that is, I can point out the exact. So he did say that he saw it. Yes, Your Honor. Yes, Your Honor. Factually, what happened and what was not only said at trial, but also at the suppression hearing, was that Mr. Herndon called 911 and reported that he had seen a vehicle parked in a handicapped spot with a broken window in the rear with glass on the ground right next to the vehicle. There was one individual in the vehicle at the time, Mr. Santos, who was in the front passenger seat of the vehicle. Now, the only difference between that, that being at trial where Mr. Herndon actually testified, and the suppression hearing was that originally when Officer Walters testified at the suppression hearing, he originally thought that Mr. Herndon was a security guard at the hospital and had called 911. And that was clarified later at trial when Mr. Herndon actually testified and said, I'm not a security guard. I actually, you know, was there with my wife. And Officer Walters was also there, just coincidentally there on another matter, and then reported directly to the parking lot. I also want to note. Counsel, before you leave that point, when the tire iron was observed, was that before or after the police had pulled in behind the car? It had happened afterwards, Your Honor, but they had never stopped that vehicle. What happened was Officer Walters was in the parking lot on foot, and Officer Kirby and minors proceeded there in the parking lot in vehicles. At that point, Officer Walters was watching the vehicle being driven by the defendant park across the street in another parking lot. They never conducted a stop of that vehicle. I understand, but my question is when they pulled in behind the vehicle, had he seen the tire iron at that point? Not until he got out, not until Officer Walters went to the vehicle and saw it in the back seat. Does the record reflect whether or not there was an avenue for the car to leave the parking lot? Your Honor, it's not clear. I believe that there was testimony from Officer Walters during the trial that there was, it was an open parking lot, and they didn't park in front of the defendant at any point, but nothing explicitly clear to say that he wasn't blocked by another building or whatever. But they did indicate specifically, Officer Kirby and Officer Walters in their testimony, that they parked behind the defendant at the time when he approached the vehicle, saw the tire iron, saw that the window was knocked out in the back. And obviously, to Officer Walters' testimony, it was unusual to see a tire iron sitting in the back of the seat. At that point, I would submit that he had reasonable suspicion, at least to confirm or dispel his suspicion that this vehicle was stolen. Now, under Belton, once Santos was arrested, they had cause to search that vehicle. They were justified in searching that vehicle. I would submit, Your Honor, in response to your questions, that in fact he was arrested for obstruction. Officer Walters asked him to let him in the vehicle for two to three minutes. That's why it wasn't just verbal, hey, can I search your car? And he said no. This went on for about two to three minutes, according to Officer Walters' testimony. He finally had the sentence physically remove him before he would leave the vehicle. That is correct, Your Honor. Was it the gentleman's obligation to show that there was a possible exit to the front of the car? Your Honor, at that point, Your Honor, I don't think that there was anything clear in the testimony. And to answer your question, I don't. There was nothing clear in the testimony, but was it the government's obligation to clear that up? I'm not aware of any precedent indicating that it was the government's obligation to clear that up. I think there was testimony from both Officer Kirby and Officer Walters to indicate specifically that they had parked behind the vehicle. And, in fact, during their testimony, if, in fact, he was blocked, I think that would have come out because there was a point made to indicate that there hadn't been a stop at that point and they had parked directly behind his vehicle. They hadn't stopped it or stopped it from any sort of egress like they did in United States v. Kim. Your Honor, I do, before my time runs out, I do want to hit a couple points specifically as to, number one, is the sufficiency of the evidence. What we had here was Officer Walters, once he searched the vehicle, he didn't have to rip that door paneling out. It was apparent to him within seconds that that door paneling was ajar. And, therefore, he didn't have to look deep to see that weapon as well. So I think it was reasonable for a jury to conclude that he did possess that weapon. He was driving that vehicle. He was in demeaning control of that weapon as well. Your Honor, as to the cross appeal by the United States, in this case, and I did brief it as far as the Almendrez decision and the Salazar-Lopez decisions made by this court, the latter made by the court, here we had the district court judge believing that, in fact, the prior convictions to qualify for ACC status must have been or should have been alleged in the indictment. And as Almendrez specifically points out, that it really does not need to be, and this court's decision in Giselle as well specifically points out that the prior convictions do not have to be alleged in the indictment itself because ACC 924C is a penalty provision rather than an element of the crime as it was in Salazar-Lopez. As the court was looking at that case, Lopez specifically states that because the government failed to allege a date, and the date was critical because the defendant in Lopez had been removed from the country on two occasions, once prior to the felony conviction and once after. And because of that, this court correctly found it was an element of the offense, whereas in Giselle and Almendrez, it correctly found that it was not. It was a penalty provision. And based on that, the United States admits that the judge incorrectly found that it was a requirement for the United States to state that in its indictment in order for him to be actually qualified as an ACC. Do you agree that Arizona being damp might have some effect on how we deal with this case? I think it would, Your Honor. But as the law was back in 2001, that the officer certainly would be justified in searching that vehicle. But to answer your question, yes, Your Honor. We ought to sit on this for a while. Yes, Your Honor. You think so? You don't think that the search is justified by the arrest of Sheldon? I do, Your Honor. Even assuming that the sentence is arrest does not justify search, why does Sheldon's arrest justify it? Well, Your Honor, I would submit that the search was conducted based on both of their arrests, but the officer's initial intent to search that vehicle was based on Santos's arrest. No doubt about it. But before he conducted the search, he arrested Sheldon, and he arrested Sheldon right there with the open door of the vehicle while he is looking for an actual weapon. I don't understand what Gant has to do with it. We don't concede that, Your Honor, as far as the propriety of the search based on the defendant's arrest. We don't concede that. And, in fact, contrary to what counsel stated, that was a big issue during the suppression hearing. In fact, Walters was asked specifically as to the defendant's arrest and how long they talked to each other or argued about the search of the vehicle before he was properly arrested for obstruction. It went on, according to Officer Walters, two to three minutes, and he was properly arrested and based on He didn't actually search or find the gun until after he was arrested. That is correct, Your Honor. Sheldon. That is correct. So why is there any reason to hold this case? Well, the only – and I'm not asking that this Court hold the case. The only way that the case would be affected would be, in fact, if this Court found that the search was not conducted based on the arrest of Sheldon as well. I will state to this Court that the original search was based on Santos's arrest, but Your Honor is correct. Before they searched that vehicle, and that was never conceded, when there was a point in the suppression hearing, before they searched that vehicle, he, the defendant, was arrested. The defendant was arrested properly for obstruction and based on facts specifically set out in the suppression hearing. Okay. Thank you. Could you briefly address the cost appeal? Well, I think defense has conceded that the prior convictions did not need to be alleged in the indictment, but they do say that the documents in the record don't establish the second-degree burglar convictions. Is that your understanding of what the issue is that remains? Correct, Your Honor. In the reply brief, just like you indicated, now they concede that, in fact, that it did not need to be alleged. As far as the documents provided, there was actually, and it's in the pre-sentence report as well, I believe it's on page 9 of the pre-sentence report, but it specifically says what the United States submitted was the allegation, which was an amended information pleading to burglary two. And that allegation specifically states that he did unlawfully enter a residence. Okay. And he pled guilty specifically to that amended information, which charges him with entering a residence. And he says, on or about September 12, 1988, I entered a building, not my own, with the intent to commit a crime therein. Now, the court in Shepard says, well, you can't just look at the charging document. You have to see what he's also pled guilty to. But, in fact, if he pleads guilty to exactly what he's charged with in this case, that is sufficient evidence to indicate that, in fact, it was a violent felony, that this was a generic burglary because, in fact, he entered a building, that being a residence, to commit a crime. And with those two documents, it was sufficient for the district court to correctly find that did, in fact, qualify as a predicate crime for ACC. Okay. Thank you. Your Honor, at this time, would you like to take a minute for rebuttal? The issue in this case is, with respect to the sentencing, isn't that the defendant admitted that he entered a residence and, therefore, it was specific. This court in Wenner said the word residence is overbroad. So you need to go beyond that. The defendant ---- In Kilgore, if you talk about an address, a residence address that can presume to be a dwelling? The language in Kilgore was so brief, it's not clear how the address was used and to what extent, you know, could the address designate something that wasn't a situation. In Stephen's case, out of Alaska, the statute was only overbroad because it referred to movable vehicles or traditional buildings. And so by giving an address, you know that it's not a movable vehicle. In this case, Washington law specifically says a fenced area could be a residence, could be a building, and, therefore, a residence, since a residence is just a building that someone inhabits. And that being the case, an address is not good enough. If I were to try to purchase a piece of property and the definition section of my ---- He said residence. He didn't say building. He said residence, and in ---- He, in his handwritten notes, said building. He said a building, the residence, I think, of the defendant in Asotin County, Washington, on or about September 12th, 1988, with contempt to commit a crime on a personal property, therein to which theft, this is the charging document, did enter, remain unlawfully in a residence, and then it gave the address. And then in the ---- he did not mention the word residence in the change of police statement. He just said a building. Yes. Is that enough? No, because the word building is overbroad. The word building is defined under Washington laws, including a lot more. And so when you're writing a document that is in the context of a set of definitions, the words you use have to make sense according to those definitions. And so if the definition of the context that I'm using, the word building, is not the same definition that we're now using in federal court, you have to look beyond that to see what they've done to make something more specific. And it's not that hard. We're lawyers. If I were to want to buy a house and I knew in the definition section of my contract that the property law defines building as including fenced-in areas, I would specify in my contract that what I'm buying is not just a building, but a building that's an improved structure of two stories in height made of masonry or what have you. We do that all the time in search warrants. We do that all the time in property law. And in the context of Washington state criminal law, when the state of Washington has chosen such a broad definition of building, it's little to ask that prosecutors making allegations with respect to buildings be more specific. Otherwise, it's simply not proven. Okay. Thank you. Thank you. Agency, I yield the floor. We are adjourned.
judges: Kozinski, Fletcher, Rawlinson